**276**

UNITED STATES, Appellee,

v.

Eric K. JONES, Private U.S. Army, Appellant.

No. 68,315.

CMR No. 9003077.

U.S. Court of Military Appeals.

Submitted Dec. 21, 1992.

Decided Sept. 29, 1993.

For Appellant: *Colonel Malcolm H. Squires, Jr., Captain Robin N. Swope, Captain Robert L. Carey.*

For Appellee: *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Major Timothy W. Lucas, Captain Sheila E. McDonald.*

PER CURIAM:

A general court-martial consisting of officer and enlisted members convicted appellant, contrary to his pleas, of larceny of a set of nun-chucks,[1] assault intentionally inflicting grievous bodily harm, assault with a dangerous weapon, and burglary, in violation of Articles 121, 128, and 129, Uniform Code of Military Justice, 10 USC §§ 921, 928, and 929, respectively. The approved sentence provides for a bad-conduct discharge, confinement of 7 years, total forfeitures, and reduction to E–1. The Court of Military Review affirmed the findings and the sentence in an unpublished opinion dated June 30, 1992. We granted review of the following issue:[2]

> WHETHER THE EVIDENCE IS SUFFICIENT TO SUPPORT THE FINDING OF GUILTY TO SPECIFICATION 1 OF CHARGE I (LARCENY OF NUN–CHUCKS).

■ Appellant contends that the prosecution did not prove beyond a reasonable doubt that he stole the nun-chucks. In our review, we are required to determine whether sufficient evidence was adduced at

---

1. Nun-chucks are a martial-arts weapon made of two pieces of wood held together by a chain or cord. *See* unpub. op. at 2 n.1.

2. In addition we granted review of the issue whether appellant's court-martial lacked jurisdiction because the military judge was designated in violation of the Appointments Clause of the Constitution. 37 MJ 24. *See generally* U.S. Const. art. II, § 2, ¶ 2, cl. 2; *Freytag v. Commissioner of Internal Revenue,* 501 U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). This issue was decided adversely to appellant in *United States v. Weiss,* 36 MJ 224 (CMA 1992), *aff'd,* —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

appellant's trial from which "any rational trier of fact could have found" him guilty of larceny "beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner,* 25 MJ 324 (CMA 1987).

■ The court-martial was convened at Fort Hood, Texas. The offenses occurred in Killeen, Texas, adjacent to Fort Hood. Mr. Ricardo Hernandez bought the nun-chucks at a garage sale and had marked and put black tape on them. On the evening of June 16, 1990, he and Mrs. Hernandez went to the theater. The nun-chucks were in their car on "the driver's side in-between the door." They could not be seen from outside the car, but they were readily visible if the car door was opened. Their car was left unlocked with the window down in a parking lot adjacent to their apartment building.

That same night—in the early morning hours of June 17—the apartment directly across the hall from the Hernandez's was burglarized by an intruder who removed a screen from a window and entered it while the occupants, Mr. Santos Lopez–Rosales and Mrs. Gregoria Trevino, were asleep in their bed. The intruder knocked Mr. Lopez–Rosales momentarily unconscious when he struck him twice on the head. Even though Mr. Lopez–Rosales did not see the attacker and did not know what he had been struck with, because "during that time he couldn't see anything because he had a lot of blood on the face," he believed that he had been struck with "[s]omething that . . . was real hard, like a piece of wood or metal."

Mrs. Trevino awoke during the commotion, and the intruder struck her three times. Like her bedmate, she did not know what she was struck with "because she didn't saw [sic]" it. However, she was able to give a partial description of the assailant, who she said was a white man, who was shirtless, but was wearing "[r]eal short" beige pants and light colored tennis shoes. She said the intruder escaped by "jump[ing] real fast through the window" located at the end of their bed.

Mrs. Trevino went to the Hernandez' apartment for help. According to Mrs. Hernandez, "[T]here was a lot of blood on [Mr. Lopez–Rosales'] face." Mr. Hernandez ran to Mickey's store, which was nearby, to call the police and an ambulance.

In the meantime, Geno Trehio, the night store clerk at Mickey's, was outside the store "hosing down the lot." He saw a white man—"probably about 20 to 25 feet" away—"running from south" who

> stop[ped] in front of me. He was breathing hard, so I thought, well, he's either been running for a long time, or he's just been running fast and got winded. He stopped and proceeded to go into the store, which I followed.

Mr. Trehio described this person as wearing a pair of gray shorts which came above his knees and apparently were once sweatpants. The man also was wearing a pair of high-top tennis shoes. However, Mr. Trehio said the man did not have a shirt on; and when the man came into the store, he saw "either a [sic] fresh scrape marks, or slap marks, something red on his right shoulder blade."

The man then bought a soda and left the store. Ten or fifteen minutes later, Mr. Hernandez came into the store and asked him whether he had seen a white man running down the street. He told him that the man had stopped at the store, bought a soda, and headed towards downtown. Mr. Hernandez then used the store telephone to call for emergency assistance.

Eventually, the police and an ambulance arrived at the scene. Before the ambulance took Mrs. Trevino and Mr. Lopez–Rosales to the hospital, Mrs. Trevino discovered that a $50.00 bill was missing from her purse. Afterwards, the police and Mr. and Mrs. Hernandez looked around the burglarized apartment, where they "found a set of keys in-between a bed and the corner of the couch." The keys included keys for a Ford vehicle, a handcuff key, and a key with a U.S. Government stamp on it.

After the police left Lopez–Rosales' apartment, Mr. and Mrs. Hernandez returned to theirs, at which time Mr. Hernandez observed through his window "somebody across the street" who "was pretty close to the grass looking for something." This person "was just back and forth looking for something.... At first he was looking on the other side in the grass. And then he came to the other side"—*i.e.,* "from the other side of the parking lot."

Mrs. Hernandez added that they saw a man "[o]n the street, and he came near to the cars .... [i]n the apartment parking lot.... It looked like he was searching for something.... He was just looking in different directions." Furthermore, Mrs. Hernandez testified that "[h]e looked pretty nervous. And besides that, when a policeman went through the streets he started running." The man met the basic description of the intruder except that he was wearing a T-shirt.

After the man left the area, Mr. Hernandez "told my wife that we needed to go to the police or to the hospital," presumedly to report their observations. As they were en route and were passing Mickey's store, Mr. Hernandez testified the police had stopped "the same man" at the store that they had seen earlier "looking for something in the grass and in the street"; and they stopped there and reported their observation to the police.

Mr. Trehio further testified that the person whom the police were detaining at the store was also the same man whom, an hour earlier, he had seen running and had come into the store to buy a soda. However, when the man returned to the store this time, he was driving a Ford pickup truck, was wearing the same shorts and tennis shoes, but had on a T-shirt. He bought some cigarettes, then left and sat in his truck. Thereupon, a police officer pulled up behind the pickup and brought the man back inside the store, where Mr. Trehio identified him as the man who came into the store earlier. Finally, Mr. Trehio testified that the police then took the man outside the store and were talking to him when Mr. Hernandez showed up at the store again. Ultimately, the man (identified as appellant) was taken into custody by the Killeen police.

According to Mr. Hernandez, later that morning he discovered that the nun-chucks were missing from his car. His car had been parked in the same parking lot where he earlier had seen a man looking for something in the grass. That day, Officer Parker from the Killeen Police Department found a set of homemade wooden nun-chucks next to the air conditioning unit outside Mickey's store, but the police could not lift any latent prints from the nun-chucks.

However, the Killeen police did find other inculpatory evidence against appellant. His fingerprints were lifted from Mr. Lopez–Rosales' window screen. Also, a fifty-dollar bill was found in appellant's possession when he was taken into custody.[3] The keys that were found in the Lopez–Rosales' apartment fit the ignition of appellant's truck and his barracks room door.

Although appellant did not testify, he previously had given the Killeen police a written statement but had refused to sign it. His story was that a hooker had picked him up earlier. After they had had sex and he had paid her, she drove off, leaving him stranded in that area. He jogged back to the downtown area to get his vehicle from where he had left it. When he got back to his truck, he realized that he had lost his keys and went back to the area to look for them.

To find that appellant was guilty of larceny, the prosecution had to prove that he wrongfully took Mr. Hernandez' nun-chucks with the intent to deprive him permanently of them. Para. 48b, Part IV, Manual for Courts–Martial, United States, 1984. The Government's theory was that appellant perpetrated the assaults with the nun-chucks that he had stolen from Mr. Hernandez' car.

---

3. Appellant was charged with stealing this $50.00 but was found not guilty.

The problem with the Government's theory is that both assault victims, Mr. Lopez–Rosales and Ms. Trevino, testified that they did not see what had hit them. Mr. Lopez–Rosales could only say that "it was real hard, like a piece of wood or metal." Similarly, Ms. Trevino testified that "[s]he didn't know if it was wood or steel," because she did not see it. Furthermore, Dr. Joshua Smith, who treated the victims at the hospital, could only generally theorize that Mr. Lopez–Rosales' injuries were caused by a sharp blow with a solid blunt instrument.

The Government argues that there is sufficient circumstantial evidence to prove appellant had discarded the nun-chucks near the air conditioner unit outside Mickey's store. We disagree. No one saw appellant go into Mr. Hernandez' car, which was unlocked, or take his nun-chucks. Mrs. Hernandez did testify that they saw a man "on the street, and he came near to the cars"—but she did not specifically say that he came near their car. Particularly since appellant was seen looking all over the parking lot and only looking in the grass for something (such as his truck keys, which he had left in the Lopez–Rosales' apartment), this hardly proves that earlier he had taken the nun-chucks from Mr. Hernandez' car. When Mr. Trehio first saw appellant 20 or 25 feet away from his store, he specifically testified that appellant was not carrying anything. Furthermore, no one observed appellant coming from the area where the air conditioner unit was located. To the contrary, Mr. Trehio testified that appellant was "just jogging" down the road fast and appeared to be out of breath. The second time he saw appellant at the store, he did not see appellant going or coming from near the store's air conditioning unit. Finally, there was no blood, fingerprints, or any other inculpatory evidence found on the nun-chucks. Accordingly, we are left with nothing but conjecture and speculation that appellant stole the nun-chucks and left them near the air conditioning unit at Mickey's store. *Cf. United States v. Ledbetter*, 32 MJ 272, 273 (CMA 1991).

Viewing this evidence in the light most favorable to the prosecution, *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d 560; *United States v. Turner*, 25 MJ 324 (CMA 1987), we hold that the evidence is insufficient to justify an inference that appellant stole the nun-chucks.

The decision of the United States Army Court of Military Review is reversed as to specification 1 of Charge I and the sentence. The finding of guilty thereon is set aside and that specification is dismissed. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for reassessment of the sentence based on the remaining findings of guilty.