# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, HERRING, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**First Lieutenant CLINT A. LORANCE**
**United States Army, Appellant**

ARMY 20130679

Headquarters, Fort Bragg
Kirsten V. Brunson, Military Judge
Colonel John N. Ohlweiler, Staff Judge Advocate (pretrial and recommendation)
Lieutenant Colonel Dean L. Whitford, Staff Judge Advocate (addendum)

For Appellant: Lieutenant Colonel Jonathan F. Potter, JA; Captain Payum Doroodian, JA; John N. Maher, Esq.; John D. Carr, Esq. (on brief); Captain Scott Martin, JA; John N. Maher, Esq.; John D. Carr, Esq. (on reply brief); Lieutenant Colonel Jonathan F. Potter, JA; John N. Maher, Esq.; John D. Carr, Esq. (Petition for New Trial); Lieutenant Colonel Jonathan F. Potter, JA; Captain Payum Doroodian, JA; John N. Maher, Esq.; John D. Carr, Esq. (reply brief on Petition for New Trial)

For Appellee:  Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Captain Samuel E. Landes, JA (on brief);[1] Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Captain Samuel E. Landes, JA (on reply brief); Colonel Mark H. Sydenham, JA; Major Daniel D. Derner, JA; Captain Samuel E. Landes, JA (brief and reply brief in response to Petition for New Trial).

27 June 2017

---------------------------------------------------
MEMORANDUM OPINION AND ACTION
ON PETITION FOR NEW TRIAL
---------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

HERRING, Judge:

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of attempted murder, murder, wrongfully communicating a

---

[1] The government's brief in response to appellant's assignment of errors, as well as appellant's reply brief, were revised and resubmitted to this court.

threat, reckless endangerment, soliciting a false statement, and obstructing justice in violation of Articles 80, 118, and 134 Uniform Code of Military Justice, 10 U.S.C. §§ 880, 918, 934 (2012) [hereinafter UCMJ]. The panel sentenced appellant to a dismissal, confinement for twenty years, and forfeiture of all pay and allowances. The convening authority approved only nineteen years confinement but otherwise approved the sentence as adjudged.

We review this case under Article 66, UCMJ. Appellant assigns six errors, only two of which—alleging discovery violations and ineffective assistance of counsel—merit discussion, but no relief. We have considered matters personally asserted by appellant under *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); and find that they lack merit.

## BACKGROUND

In 2012, appellant and members of 4th Brigade Combat Team (BCT), 82nd Airborne Division were deployed to Afghanistan. During this time, the Chairman of the Joint Chiefs of Staff's Standing Rules of Engagement (SROE) were in effect. The SROE permitted soldiers to use force in defense of themselves or others upon the commission of a hostile act or the demonstration of imminent hostile intent. There were no declared hostile forces, and thus no authority to engage any person upon sight.

In June 2012, First Platoon of the BCT was situated at an outpost named Strong Point Payenzai, located near the village of Sarenzai in the Zharay district of Kandahar province. First Platoon had recently lost their platoon leader to injury from an improvised explosive device (IED), and had suffered other casualties in the months prior. Appellant, who had spent the deployment as the squadron liaison officer (LNO) at the brigade tactical operations center (TOC), was assigned to take over as the platoon leader.

On 30 June 2012, appellant, in his new role, was leading the platoon back to Strong Point Payenzai from the Troop TOC at Strong Point Ghariban. As they approached the Entry Control Point (ECP), appellant encountered an Afghan villager with a young child. The villager was asking to move some concertina wire on the road leading to Strong Point Payenzai that was impeding his ability to work on his farm. Appellant told the villager that if he touched the concertina wire, he and his family would be killed. Appellant conveyed the seriousness of his message by pulling back the charging handle of his weapon and pointing the weapon at the young child. Appellant ended the encounter by instructing the villager to come to his shura, a meeting, and to bring twenty people.

The next day, appellant ordered two of his soldiers to go up into one of the towers and shoot harassing fire in the general direction of villagers. Appellant told the soldiers he was doing this in order to provoke the villagers' attendance at the upcoming shura. Hearing the shots, the Troop TOC radioed Strong Point Payenzai for a report. Appellant instructed a noncommissioned officer to respond by falsely reporting the Strong Point was receiving fire.

On 2 July 2012, a mission brief was held for the platoon and their accompanying Afghanistan National Army (ANA) element before they left to go on a patrol. In this briefing, it was announced that motorcycles were now authorized to be engaged on sight, although the testimony was somewhat inconsistent with at least one soldier recalling this coming from the ANA while others identified appellant as the source of this new information. Appellant had posted a sign in the platoon headquarters prior to the patrol stating that no motorcycles would be permitted in the area of operations. As the platoon, with the ANA element in the lead, moved out they encountered a number of villagers near the ECP complaining about the shots from the day prior. Appellant told the villagers that they could discuss it at the upcoming shura. Appellant told the villagers to leave and then began counting down from five. The platoon began its patrol.

Not long into the patrol, Private First Class (PFC) Skelton, the Company Intelligence Support Team (COIST) member attached to the platoon headquarters element, called out to appellant that he observed a motorcycle with three passengers. PFC Skelton did not report any hostile actions, but simply that he spotted a motorcycle with three passengers in his field of view. Appellant did not ask whether the motorcycle passengers were presenting any threat. Appellant ordered PFC Skelton to engage the motorcycle. PFC Skelton complied and fired his weapon, but missed. At trial, PFC Skelton testified that he would not have fired upon the motorcycle or its passengers on his own, because "there was no reason to shoot at that moment in time that presented a clear, definitive hostile intent and hostile act."

Apparently in response to the impact of PFC Skelton's rounds, the motorcycle stopped, the male passengers dismounted and began walking in the direction of the ANA unit. The ANA soldiers did not open fire, but rather gesticulated to the men, who then headed back to their motorcycle. As the three men returned to the motorcycle, appellant, over his portable radio, ordered the platoon's gun truck to engage the men. Private E-2 (PV2) Shiloh, the gunner on the 240 machine gun in the gun truck that had overwatch of the patrol, had continuous observation of the victims from after the first set of shots by PFC Skelton. Upon receiving appellant's order, Private Shiloh fired his weapon, killing two of the riders and wounding the third. The third victim ran away into the village. Prior to the engagement, the victims had

no observable weapons or radios, and were not displaying any hostility toward U.S. or Afghan forces. According to PV2 Shiloh, the only reason he engaged the men was because he was ordered to do so by appellant. Following the engagement, the two deceased victims were on the ground, and the motorcycle was standing up, kickstand still down. Upon learning that the motorcycle was still standing, Appellant ordered PV2 Shiloh to engage and disable the motorcycle. PV2 Shiloh refused this order, noting that a young boy was nearby.

Shortly after this engagement, helicopter support came on station. The aircraft crew received a request to locate the third motorcycle rider last seen running into the village. While on station, the pilot took aerial photographs of the two deceased victims and the motorcycle. Sergeant First Class (SFC) Ayres, the platoon sergeant, linked up with appellant to find out what happened, as he had heard the shots moments before. Appellant told SFC Ayres that the aircraft had spotted the men on the motorcycle with weapons before his troops engaged.

Appellant ordered two soldiers, PFC Wingo and PFC Leon, to conduct a Battle Damage Assessment (BDA) of the deceased victims. BDAs normally entailed taking photographs, obtaining biometric data, and testing for any explosive residue on the bodies. Private First Class Skelton was the soldier trained and equipped to conduct a BDA and was also responsible for briefing the TOC afterwards. Even though PFC Skelton was standing right next to appellant, appellant had PFC Wingo and PFC Leon conduct the BDA, neither of whom had the training or equipment to properly perform the task. When PFC Skelton reminded appellant that he was supposed to do the BDA, appellant told PFC Skelton not to because he wouldn't like what he saw.

After the two soldiers conducted a cursory inspection of the victims, appellant told the gathered villagers to take the bodies. The soldiers did not find any weapons, explosives or communications gear on the bodies. Appellant then told the radio transmission operator (RTO) to report over the radio that a BDA could not be done because the bodies were removed before the platoon could get to them. When the RTO did not make this report, appellant took over the radio and made this report to Captain (CPT) Swanson, the Troop Commander.

After the mission, and back at Strong Point Payenzai, appellant told PFC Skelton not to include the BDA information in his upcoming brief to the TOC. Private First Class Skelton went to the TOC at Strong Point Ghariban to deliver his intelligence brief on the patrol. Upon arriving, he informed the COIST platoon leader that he needed to speak with CPT Swanson. PFC Skelton told CPT Swanson what happened on the patrol and that he believed they may have civilian casualties.

Shortly thereafter, appellant was relieved of his duties pending an investigation into the events.

## LAW AND ANALYSIS

### A. Discovery Violations

"Article 46, UCMJ, provides the trial counsel, defense counsel, and the court-martial with 'equal opportunity to obtain witnesses and other evidence in accordance with' the rules prescribed by the President." *United States v. Stellato*, 74 M.J. 473, 481 (C.A.A.F. 2015) (quoting Article UCMJ art. 46). The Rules for Courts-Martial elucidate the trial counsel's unique obligations in furtherance of Article 46's mandate. In this case, the two pertinent provisions are: that the "trial counsel shall, as soon as practicable, disclose to the defense the existence of evidence known to the trial counsel which reasonably tends to negate…or reduce" the guilt or punishment of the accused; and that the trial counsel shall permit the defense to inspect certain items "which are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense." Rule for Courts-Martial [hereinafter R.C.M.] 701(a)(6), R.C.M. 701(a)(2)(A). The former provision requires no triggering action on behalf of the defense, while the later provision requires a request from the defense to trigger the trial counsel's obligation, for "[w]ithout the request, a trial counsel might be uncertain in many cases as to the extent of the duty to obtain matters not in the trial counsel's immediate possession." R.C.M. 701 analysis at A21-34. As we have stated before, the distinction between the two provisions is significant, because "whether the trial counsel exercised reasonable diligence in response to the request will depend on the specificity of the request." *United States v. Shorts*, 76 M.J. 523, 530 (Army Ct. Crim. App. 24 Jan. 2017).

R.C.M. 701(a)(6) is based on *Brady v. Maryland* and its progeny, which in turn, is derived from the Due Process Clause of the Fifth Amendment. *See generally Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the prosecution to disclose evidence that is material and favorable to the defense. *Id*. at 87. This is an affirmative duty to disclose and requires no triggering action by the defense. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). Evidence is said to be material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). The "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" has long been a recognized duty of trial counsel. *Id*. at 437. In order to have a "true *Brady* violation ". . . the evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler,* 527 U.S. at 281-82.  Courts have a responsibility to consider the impact of undisclosed evidence dynamically, in light of the rest of the trial record. *United States v. Pettiford*, 627 F.3d 1223, 1229 (D.C. Cir. 2010) (citing *Agurs*, 427 U.S. at 112).  "Once a *Brady* violation is established, courts need not test for harmlessness." *United States v. Behenna*, 71 M.J. 228, 238 (C.A.A.F. 2012) (citing *Kyles*, 514 U.S. at 435-36).

With the above framework in mind, we now work through appellant's contention that the government violated its discovery obligations.  Appellant asserts that the discovery request from detailed counsel was a specific request for information and not just a general request.  Appellant's own brief here on appeal, as well as the actions of appellant pre-trial belie that assertion.

There is nothing in the record that supports any inference that the defense was unsatisfied with the government's response to its discovery request, such as a motion to compel.  Nor is there anything that supports a finding that the defense contemplated a search of specific intelligence databases.  Rather, the language of the discovery request reflects the typical boilerplate request for discovery, although it included the language "deceased persons."  We therefore treat this as a general request for discovery and find that the exercise of reasonable diligence in response to this request did not include searching intelligence databases.  While we have long held that the rules of military discovery are generous, we decline to now require trial counsel to seek out and search into the abyss of the intelligence community for the potential existence of unspecified information.

In addressing *Brady*, we first consider whether the information presented by appellant regarding the identities and associations of the victims was favorable to appellant.  Even assuming we accept appellant's information concerning the victims as true,[2] we come to three conclusions.

---

[2] This court strains to accept the information presented in the video presentation (Def. App. Ex. K) at face value given that many asserted facts contained therein are not supported by trial testimony and, in fact, are directly contradicted by trial testimony.  We specifically point to the purported signs that restricted motorcycles from the area.  While there was testimony that such a sign was posted by appellant in the unit TOC, there was no testimony that any signs were posted in the area of Route Chilliwack, where the shootings occurred.  The exhibit also asserts that air assets were on station before the shooting of the three men.  The trial testimony of the pilot of the aircraft and the soldiers on the ground all have the aircraft arriving on scene after the engagement at the center of this trial.  Appellant's video presentation was more an attempt at persuasive argument rather than a helpful presentation of data and link analysis of information obtained from intelligence databases.

First, with respect to the two deceased victims, the older victim, identified by witnesses at trial as the village elder, knew someone who was linked to hostile action against U.S. forces. The younger victim was biometrically linked to an IED incident that occurred prior to 2 July 2012. Second, the surviving victim was allegedly involved in hostile action against U.S. forces *after* he was wounded and his two compatriots were killed by U.S. forces on 2 July 2012. Third, and perhaps most importantly, appellant was not aware of any of this information at the time he ordered his soldiers to engage.

The testimony of PFC Skelton, who first observed the motorcycle, paints a clear picture of what happened. He identified the motorcycle and three passengers, and reported that information to appellant. PFC Skelton did not report any hostile actions. Appellant did not ask whether the motorcycle passengers were presenting any threat; he simply ordered PFC Skelton to engage. PFC Skelton testified that he would not have fired upon the motorcycle or its passengers on his own, because "there was no reason to shoot at that moment in time that presented a clear, definitive hostile intent and hostile act."

The testimony of PV2 Shiloh, the 240 gunner, supports that these men posed no discernable harm. The motorcycle was parked and the three men were returning to the motorcycle at the direction of the ANA element at the time he opened fire. According to PV2 Shiloh, he engaged the three men based solely on the order from the appellant.

In considering any nondisclosure dynamically, as we are required to do, the evidence presented by the government on the murders and attempted murder was overwhelming. Appellant had no indications that the victims posed any threat at the time he ordered the shootings. Assuming arguendo, that the information was found and turned over to appellant before trial, we can see no scenario for the admissibility of such evidence during the trial. As stated previously, the negative information about the surviving victim was derived from actions he took after his two compatriots were shot and killed on appellant's orders. The actions of the surviving victim after the shootings would have no relevance on what appellant knew at the time he ordered the shootings. In fact, it is the more likely scenario that the government would have been able to capitalize on this aggravating evidence in presentencing by demonstrating why the SROE exist, and the direct impact on U.S. forces when the local population believe they are being indiscriminately killed. The same is true for the deceased victims. That the village elder knew someone associated with a hostile act cannot be used to infer that he posed a threat at that date and time. Similarly, if the other deceased victim was "linked" to a hostile act on a prior date, that is not sufficient to bring him in to the category of individuals that can be lawfully targeted under the SROE.

The rules of discovery "are themselves grounded on the fundamental concept of relevance." *United States v. Graner*, 69 M.J. 104, 107 (C.A.A.F. 2010). "None

but facts having rational probative value are admissible." (quoting 1 John Henry Wigmore, *Evidence in Trials at Common Law* 655 (Peter Tillers rev. 1983)). The aforementioned information simply has no tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Military Rules of Evidence [hereinafter Mil. R. Evid.] 401. This is particularly true in this incident as the appellant had no knowledge of this information at the time he made the decision to engage.

Since we do not find that the discovered information was favorable to appellant, we need not address the nondisclosure or prejudice prongs. Consistent with our holding in *Shorts*, "to comply with *Brady*, a trial counsel must search his or her own file, and the files of related criminal and *administrative investigations*. However, consistent with our superior court's interpretation of the issue, we require a trial counsel only exercise due diligence." 76 M.J. at 532 (citing *United States v. Simmons*, 38 M.J. 276 (C.A.A.F. 1993)). Here, we find trial counsel exercised the diligence due under *Brady* and as required under defense counsel's discovery request.

### B. Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, which we review de novo, an appellant must show: that counsel's performance fell below an objective standard of reasonableness; and that "counsel's deficient performance gives rise to a 'reasonable probability' that the result of the proceeding would have been different without counsel's unprofessional errors." *United States v. Akbar*, 74 M.J. 364, 371 (C.A.A.F. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). We are also mindful that in evaluating the first *Strickland* prong, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. As to our evaluation of the second *Strickland* prong, we must determine whether, absent counsel's errors, there is a reasonable probability the factfinder would have had a reasonable doubt as to appellant's guilt. *Id*. at 695.

> A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defense as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id*. at 697.

8

Even though appellant primarily focuses his claim against civilian defense counsel, for purposes of ineffective assistance of counsel claims, "the performance of defense counsel is measured by the combined efforts of the defense team as a whole." *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001) (citing *United States v. Boone*, 42 M.J. 308, 313 (C.A.A.F. 1995)). Therefore, we consider appellant's claims in light of the defense team's performance as a unit. We also consider every claim by appellant balanced against the complete record before us, including the "experience, and abilities of trial defense counsel; the pretrial proceedings; the investigative efforts of the defense team; the selection of the court members; the trial strategy; the performance of counsel during the trial; the sentencing case; and the posttrial proceedings." *United States v. Murphy*, 50 M.J. 4, 8 (C.A.A.F. 1998).

The record reflects that appellant was fully advised of his rights, the evidence against him, and that he substantively communicated with his defense team regularly. He was routinely consulted for his opinion on trial strategy, and was intimately involved with the decision making of his defense team. The trial strategy adopted by the defense, with the endorsement of appellant, was that these were combat related shootings and not orders to murder. To that end, the defense team competently pursued this theory at every stage of the proceedings. The defense team worked to portray the appellant as a "by the book" officer trying to bring discipline back to a unit that had gotten lax under its prior platoon leader. They also attempted to explain his actions as those of an aggressive young officer trying to protect his men from further harm. The defense questioned numerous government witnesses to expound on the frequent use of motorcycles by hostile elements in this area of operations. Given the overwhelming evidence against appellant, it is difficult to conceive of any other viable defense. [3]

---

[3] Appellant's affidavit asserts civilian defense counsel was persistently unprepared, did not keep in contact with appellant before trial, and did not consult with appellant on, amongst other things, evidence, the pros and cons of offering a plea, the relative strength of the government's evidence, overall strategy and presentencing. This affidavit makes no mention of the efforts of appellant's military defense counsel. Civilian defense counsel and appellant's military defense counsel submitted affidavits painting a much different picture and, read together, show a defense team that kept appellant involved in each stage of his court-martial, both before and after trial. One area of agreement concerns the overall defense theme that this was a combat case, not a murder case. Under the circumstances of this case, we see no need to order a fact-finding hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). First, even if we accept appellant's claims at face value, he has failed to show how he was prejudiced by the stated deficiencies of his defense counsel. The government presented overwhelming evidence of

( continued . . .)

Even had the defense team located biometric evidence pertaining to the victims, and it was somehow introduced into evidence, there is no reasonable probability that the result of the proceeding would have been different. On the contrary, had this evidence been presented at trial, it is likely the panel members would have considered it an aggravating factor. The fact that the surviving victim was linked to hostile action against U.S. forces only *after* his compatriots were killed illustrates that appellant's actions directly resulted in a significant adverse impact on the mission of the command. This is also supported by detailed defense counsel's affidavit when he discussed his rationale for being unable to make a site visit. That is, after the village elder was killed in this incident, the area became so kinetic that U.S. forces withdrew from there altogether.

**CONCLUSION**

The Petition for a New Trial is DENIED.[4] The findings of guilty and the sentence are AFFIRMED.

Senior Judge TOZZI and Judge BURTON concur.

FOR THE COURT:

JOHN P. TAITT
Chief Deputy Clerk of Court

---

(. . . continued)
appellant's guilt and appellant has not shown how a different approach by defense counsel during preparation for or at trial would have resulted in a different outcome. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). Second, appellant's focus on the performance of his civilian defense counsel to the exclusion of the efforts of his detailed defense counsel ignores our examination of the overall efforts of the defense team. In this respect, appellant's affidavit is conclusory as to his defense team's supposed ineffectiveness in that it doesn't address the many contributions and efforts of his military defense counsel in the overall effort at trial. *Id.*

[4] We note this court granted appellant's request for expedited consideration of his petition for a new trial on 13 November 2015. The basis for this petition was the same information that forms the basis for the appellant's discovery assignment of error. The parties continued to submit filings on this issue and we did not receive the last filing, appellant's revised reply brief, until 21 November 2016. Thus the delay in addressing appellant's petition for a new trial.

10