# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI,[1] SCHASBERGER, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant ROBERT BALES**
**United States Army, Appellant**

ARMY 20130743

Headquarters, I Corps
Jeffery R. Nance, Military Judge
Colonel William R. Martin, Staff Judge Advocate

For Appellant: Mr. Aaron B. Maduff, Esquire (argued); Major Christopher D. Coleman, JA; Mr. John N. Maher, Esquire; Mr. John D. Carr, Esquire; Mr. Aaron B. Maduff, Esquire (on brief and reply brief).

For Appellee: Captain Austin L. Fenwick, JA (argued); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Captain Tara O'Brien Goble, JA; Major Anne C. Hsieh, JA (on brief); Major Michael Korte, JA.

27 September 2017

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BURTON, Judge:

In the early morning hours of 11 March 2012, appellant walked off his military outpost, Village Stability Platform (VSP) Belambay in Kandahar Province, Afghanistan, and entered two Afghan villages nearby where he shot twenty-two Afghan civilians in their homes, murdering sixteen of them and wounding six. Appellant now seeks a sentence rehearing alleging the prosecution failed to disclose evidence related to his case, the court failed to investigate a military judge's disclosure of protected information, and an unreasonable multiplication of charges for sentencing. We disagree and affirm the findings and sentence.

A military judge sitting as a general court-martial, convicted appellant, pursuant to his pleas, of sixteen specifications of premediated murder, six

---

[1] Senior Judge Tozzi took final action while on active duty.

specifications of attempted murder, one specification of violating a lawful general order, one specification of wrongfully using a Schedule II controlled substance, four specifications of intentional infliction of grievous bodily harm, one specification of assault with a dangerous weapon, one specification of assault consummated by battery,[2] and one specification of wrongfully burning bodies, in violation of Articles 80, 92, 112a, 118, 128 and 134, Uniform Code of Military Justice, 10 U.S.C §§ 880, 912a, 918, 928, 934 (2012) [hereinafter UCMJ]. A panel sentenced appellant to a dishonorable discharge, confinement for life without the possibility of parole, forfeiture of all pay and allowances and reduction to the grade of E-1. The convening authority deferred the reduction in rank and the adjudged forfeitures until action. The remainder of the sentence was approved. The automatic forfeitures of all pay and allowance required by Article 58b, UCMJ, were further waived at action for a period of six months with direction that these funds be paid for the benefit of appellant's wife and children. Appellant was credited with 527 days of pretrial confinement credit.

We review this case under Article 66, UCMJ, and conclude one of appellant's assigned errors merits discussion but no relief. Similarly, we considered those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), one of which also warrants discussion but no relief.

## BACKGROUND

Appellant was deployed to Afghanistan and was stationed at VSP Belambay. In the early morning hours of 11 March 2012, appellant left VSP Belambay and travelled to the village of Alikozai. Appellant was armed with his M4 rifle, H&K 9 millimeter pistol, advance combat helmet with night vision device, one full magazine containing thirty 5.56mm rounds for his M4 and one magazine containing fifteen 9mm rounds for his H&K pistol. While in Alikozai, appellant killed four people by shooting them at close range, which included two elderly men, one elderly woman and one child. Appellant also assaulted six people, which included one woman and four children.

When appellant ran low on ammunition, he returned to VSP Belambay to obtain additional ammunition. Appellant left VSP Belambay for a second time, this time armed with his M4 rifle, 9mm H&K pistol, M320 grenade launcher with accompanying ammunition belt, night vision device and ammunition for all of his weapons. Walking south, appellant entered the village of Naja Bien. While in Naja Bien, appellant entered a home where a family was sleeping. Appellant pulled a man from the home to an adjacent courtyard, where he killed the man in front of his family by shooting him at close range. Appellant then entered another home where a different family was sleeping. With the fire selector switch on his M4 set for three-

---

[2] In February 2012, appellant assaulted an Afghan truck driver in front of several junior enlisted soldiers.

round bursts, he shot ten people in the head at close range, which included three women and six children. Appellant then grabbed a kerosene-filled lantern from the floor, emptied the contents onto the bodies of the individuals he had just murdered, lit a match and set the bodies on fire. As he was leaving, appellant shot an elderly woman in the chest and head at close range with his 9mm. The woman did not die from being shot so appellant crushed her skull with his boot, stomping with so much force that her face and head were mutilated.

As appellant was returning to VSP Belambay, he was met by three soldiers. The soldiers seized appellant's M4 rifle, M320 grenade launcher, H&K 9mm pistol, numerous magazines and ammunition for those three weapons as well as appellant's helmet, night vision device, and a large piece of blue decorative fabric that appellant had taken from one of the homes and was wearing on his back. Appellant's clothes were soaked in blood.

Appellant was escorted to the Operations Center, were he was guarded by two soldiers until special agents from the Criminal Investigation Command (CID) arrived. While being guarded, appellant made several statements to include: "I thought I was doing the right thing," "I'm sorry that I let you guys down," "My count is twenty," "It's bad, it's really bad," and "We should have hit them harder."

When CID arrived, the special agents seized appellant's computer, clothing, weapons, and ammunition. They also discovered and seized anabolic steroids that appellant had hidden under the boardwalk outside of his room.

## LAW AND DISCUSSION

### A. *Alleged Due Process and Discovery Violations*

On appeal, appellant claims he is entitled to a new sentencing hearing because, *inter alia*, the government violated his due process and discovery rights and committed fraud upon the court-martial. Appellant's claims are largely based on his post-trial discovery of "undisclosed evidence" that is not properly before this court. Specifically, appellant moved this court to attach as an appellate exhibit a declaration from a defense consultant, who was retained post-trial, which purportedly "linked" several government witnesses to improvised explosive device (IED) events both before and after the charged offenses. Although offered in the form of a sworn declaration, the information contained in the declaration and accompanying enclosure was of uncertain origin, authenticity, reliability, and classification. Moreover, appellant's assertion that the information in the declaration was known to the government prior to trial was made without supporting evidence. Accordingly, after our initial consideration and subsequent reconsideration, we denied appellant's request to attach the declaration to the appellate record. Therefore, any claim of relief based on this "undisclosed evidence" is unfounded.

The Due Process Clause of the Fifth Amendment requires the prosecution to disclose evidence that is material and favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is said to be material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). This is an affirmative duty to disclose and requires no triggering action by the defense. *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" has long been a recognized duty of trial counsel. *Kyles*, 514 U.S. at 437. In order to have "a true *Brady* violation[, t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler,* 527 U.S. at 281-82. Courts have a responsibility to consider the impact of undisclosed evidence dynamically, in light of the rest of the trial record. *United States v. Pettiford*, 627 F.3d 1223, 1229 (D.C. Cir. 2010) (citing *Agurs*, 427 U.S. at 112). "Once a *Brady* violation is established, courts need not test for harmlessness." *United States v. Behenna*, 71 M.J. 228, 238 (C.A.A.F. 2012) (citing *Kyles*, 514 U.S. at 435-36).

In addition, "Article 46, UCMJ, provides the trial counsel, defense counsel, and the court-martial with 'equal opportunity to obtain witnesses and other evidence in accordance with' the rules prescribed by the President." *United States v. Stellato*, 74 M.J. 473, 481 (C.A.A.F. 2015) (quoting Article 46, UCMJ). The procedural rules as prescribed by the President explain the trial counsel's unique obligations in furtherance of this statutory mandate by Congress. In this case, there are two pertinent provisions. First, Rule for Courts-Martial [hereinafter R.C.M.] 701(a)(6) states: "[t]he trial counsel shall, as soon as practicable, disclose to the defense the existence of evidence known to the trial counsel which reasonably tends to [n]egate" or "[r]educe" the guilt or punishment of the accused. Second, R.C.M. 701(a)(2)(A) provides the trial counsel shall permit the defense to inspect certain items "which are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ."

The former provision "is limited to information 'known to the trial counsel[,]'" but does not require materiality or a triggering request by the defense. *United States v. Shorts*, 76 M.J. 523, 530-31 (Army Ct. Crim. App. 2017) (quoting R.C.M. 701(a)(6)). Conversely, the latter provision is not limited to information known to the trial counsel, but requires materiality and an express request to trigger the government's obligation because "[w]ithout the request, a trial counsel might be uncertain in many cases as to the extent of the duty to obtain matters not in the trial counsel's immediate possession." R.C.M. 701 analysis at A21-34. As we have stated before, the distinction between the two provisions is significant, because

"whether the trial counsel exercised reasonable diligence in response to the request will depend on the specificity of the request." *Shorts*, 76 M.J. at 530.

Limiting our consideration to the record properly before us and with the above legal framework in mind, we review de novo appellant's remaining claims related to his initial discovery request and the "rumors" concerning a government witness. *See United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004) (distinguishing between the deference ordinarily given to discovery ruling by a military judge and the de novo review of purely legal questions like a "military judge's determination of materiality").

*1. Appellant's Initial Discovery Request*

In this case, the scope of appellant's pretrial discovery requests included the following:

> 2. Any books, papers, emails . . . computer files . . . which are in the possession, custody, or control of military or U.S. and Afghani [sic] authorities, and which are material to the preparation of the defense . . . .
>
> . . . .
>
> [6.]d. All material, emails, documents, etc[.] . . . related to updates regarding the progress of this case provided to any person, organization, Government entity (military or civilian) or any foreign military or civilian person or organization. . . . This request is on-going.
>
> . . . .
>
> 24. Disclosure of all evidence affecting the credibility of any and all witnesses, potential witnesses, complainants, victims, and persons deceased ("these persons") who were in any way involved with the instant case and/or any charged or uncharged related offenses, including but not limited to:
>
> a. . . . all Afghan or intelligence files or data lists
> . . . .
>
> b. Any information of any prior and/or subsequent propensity on the part of any witness and/or alleged victim to be an aggressor, to incite aggressive behavior, and or any other pertinent trait of character of any witness and/or alleged victim. M.R.E. 404(a)(2) and (a)(3).

The government's response to appellant's discovery request included Bates-stamped and indexed files delivered to the defense in excess of 36,000 pages. Additionally, the government provided broad discovery of classified evidence, which included several hundred pages of documents in indexed form, as well as DVDs with copies of entire folders from the Special Operations Task Force-Secret share portal, the Coalition Task Force (CTF) Arctic Wolves share portal, and the CTF Arrowhead share portal.

Defense counsel filed a motion to compel discovery in which they acknowledged that they "cannot provide the exact information that it seeks, nor can the Defense tell the Government of the location of such evidence." At a subsequent hearing, defense counsel stated: "Sir, since the original filing of the defense discovery request back in January, of course *most of these things have in fact taken care of themselves*." (emphasis added). Defense counsel raised a few outstanding discovery issues but none of the remaining issues related to biometric data or derogatory information for any of the government's witnesses. Therefore, regarding the discovery of evidence under R.C.M. 701(a)(2), appellant's initial request for information about the character of the victims and government witnesses appears to have been satisfied or abandoned.

   2.  *Appellant's Request for Character Evidence Related to a Government Witness*

The government filed a motion in limine that sought to limit defense counsel's references to unsubstantiated allegations regarding the victims, to include arguments that one of the government witnesses had ties to the Taliban. Specifically, the government wanted to exclude from evidence the unverified claim that BN's biometric data appeared to match the biometric data of a former Coalition Forces detainee. In a subsequent motions hearing, defense counsel represented to the military judge that while they intended "to portray the general atmosphere" in which appellant committed the offenses, they did not intend to offer evidence "as to the innocence of the victims as a whole group." Instead, defense counsel's request for character evidence was limited to the rumors pertaining to BN, as articulated in the following discussion:

> ATC1:  Yes, Your Honor.  There was innuendo and rumor potentially that there had been an investigation related to this one witness.  That led to our initial filing of the motion.  We have subsequently, pursuant to a request from the defense, we had asked before as well, re-inquired of the Department of State to see if there is any document, any investigation, any paperwork whatsoever to a negative response -- in other words, they responded that they have no such investigation, they have no documentation whatsoever to that effect.  We replied on 16 August, last Friday, to the defense to that effect.  So there is nothing to

provide. Obviously we understand *Brady* and the requirements thereof. We have nothing to give the defense because we have inquired and ----

MJ: And there is none?

ATC1: As far as we know based on our inquires ----

MJ: As long as the [S]tate [D]epartment is telling you the truth?

ATC1: Yes, Your Honor, and we certainly believe that they are.

MJ: So do I.

CDC: Your Honor, I guess then the defense, we'll submit that for a discovery request. I'd still like to know what the rumor was, what the information is, where this came up. We had no idea of this issue at all until they moved to exclude it. So I'd just like to know what is going on at all.

MJ: Okay. Well, get with them and find out. The other side of this though, Defense, is -- I mean, even if the information does exist, and it is, you know, potentially *Brady* material, it seems to me that it relates to the defense's [sic].

CDC: Your Honor, the defense's position would be that that depends what the witness testifies to on the stand. So for instance, if the witness was in fact detained by [C]oalition [F]orces in [sic] found to be a member of the insurgency and the witness testifies on the stand that he is not and never has been a member of that and goes on about it, then it becomes relevant as something besides the defense.

MJ: Well, is this witness testifying?

ATC1: He is, Your Honor.

MJ: Okay. Is somebody going to ask him that question?

ATC1: We don't intend to, Your Honor.

CDC: I'm not going to ask him, but I have no idea, as the government has pointed out, what he's actually planning to say on the stand.

MJ: Back to that. Okay. Well, you all get together and talk about this ----

CDC: Okay.

MJ: ---- and if we need to talk about it further, we can talk about it further. But it seems to me that, you know, the trial counsel has done their due diligence and they've received the response from the [S]tate [D]epartment that there is no such investigation. Now, they can tell you where they heard this rumor from, you know, and you all can run that to the ground if you want to and see if there's anything there that needs to be. But I don't think the discovery rules, nor *Brady*, require the government to hold a congressional investigation into the [S]tate [D]epartment's assertion that there was no such investigation to make sure that, under oath, somebody from the [S]tate [D]epartment says that there was no such investigation. I think they've done, in other words, what they are required under the law to do to determine if there's any investigation into this individual such that there may be *Brady* material to provide to the defense.

CDC: Yes, Your Honor.

MJ: All right. So you all get together and figure out where the rumor came from and if there's anything that grows out of that that I need to hear about and decide on, let me know and I will.

ATC1: Yes, Your Honor.

MJ: Otherwise, I'm going to mark this as resolved; not requiring a ruling from me at this point, that's what resolved stands for.

Here, the record of trial demonstrates the government's prior knowledge of the claimed "undisclosed evidence" was limited to unsubstantiated rumors. The government's efforts to substantiate the rumors left them uncorroborated. Consistent with our holding in *Shorts*, "to comply with *Brady*, a trial counsel must search his or her own file, and the files of related criminal *and administrative*

*investigations*. However, consistent with our superior court's interpretation of the issue, we require a trial counsel only exercise due diligence." 76 M.J. at 532 (citing *United States v. Simmons*, 38 M.J. 276 (C.A.A.F. 1993)). We find trial counsel exercised the diligence due under *Brady* and as required under R.C.M. 701(a). Furthermore, we presume any concerns defense counsel had at the time of trial were resolved or abandoned as no further action was taken on the record pertaining to BN. Appellant has failed to show on appeal that the government's efforts to discover information related to BN or any other witness were either insufficient or disingenuous.

### 3. Immateriality of the "Undisclosed Evidence"

Notwithstanding the apparent satisfaction or abandonment of appellant's evidentiary requests, we specifically note the lack of materiality concerning the allegedly "undisclosed evidence" pertaining to BN (and the other witnesses and victims). Even assuming the information pertaining to these witnesses was discovered and disclosed to appellant before trial, we see no scenario for the use of such evidence for impeachment during the presentencing phase of trial based on the witnesses' testimony.[3] This is particularly true where, as in this case, appellant has disclaimed any lawful justification for his use of deadly force in the following stipulation of fact:

> Specifically, the Accused did not honestly believe that any of his victims intended to immediately kill him or inflict grievous bodily harm against him, and it was objectively unreasonable to believe that any of his victims from the night of 11 March 2012 posed an immediate threat when he attacked them while they were peacefully in their homes, mostly asleep, all unarmed, and while the Accused was heavily armed with multiple lethal firearms. The Accused agrees that most of his victims were women, children, and old men, not military-age males. *The Accused agrees that he had no intelligence that any of his victims were members of the insurgency or enemy combatants. He did not have any information that the homes where he committed the massacres housed any members of the insurgency or enemy combatants.*

---

[3] At trial, defense counsel conceded the information they believed about BN would not be relevant unless BN was questioned and denied any involvement with IEDs or the Taliban. BN testified about the appearance of his brother after he was murdered and the impact of his brother's death on his family. BN was not questioned by the defense.

9

. . . .

> The Accused specifically waives the defense of defense of
> others. The Accused understands that defense of others
> may be a complete defense to the offenses of Charges I, II,
> and III in this case, and recognizes that this defense does
> not apply to him. Specifically, the Accused did not have a
> reasonable belief that death or grievous bodily harm was
> about to be inflicted on him or his fellow Soldiers at VSP
> Belambay. The Accused did not have a reasonable belief
> that death or grievous bodily harm was about to be
> inflicted on any person defended, and did not actually
> believe that the force he used was necessary to protect any
> person. The Accused's victims, resting or sleeping in
> their own homes, posed no threat whatsoever to the
> personnel on VSP Belambay or any other Coalition Forces
> in Afghanistan at the time of the Accused's murders.
>
> . . . .
>
> The Accused specifically waives the defense of obedience
> to orders. The Accused was not acting under any order
> from any person of authority to commit any of the acts
> that form the basis for the charges in this case. He did not
> believe that he was acting pursuant to any lawful order or
> authority.

(emphasis added). There was no information the government possessed that was not disclosed to appellant. Even assuming, arguendo, there was, the evidence appellant suggests was immaterial. Therefore, we find no basis for granting appellant's requested relief.

### B. Government's Sentencing Argument

Relying on the same "undisclosed evidence," appellant alleges the government committed fraud upon the defense and the court-martial panel during presentencing argument by referring to the witnesses and victims as "innocent" or "farmers."[4] At trial, defense counsel made no objections to the government's use of either reference. However, on appeal, appellant specifically alleges as fraudulent the following argument by the government:

---

[4] In argument spanning nineteen pages in the trial transcript, the government referred to innocent people approximately six times and made two references to farming.

10

> Most of the people in Alikozai, like the people who live at
> the two homes you see in front of you, are farmers making
> a living growing crops, typically of grape or wheat,
> oftentimes on someone else's property.
>
> . . . .
>
> While [appellant] continues his walk home, just a
> thousand meters away at FOB Zangabad, [appellant's]
> victims from the village of Alikozai have arrived, having
> been brought there by the heroic efforts of [F, son of MN]
> . . . . [F, son of NM,] brings with him five of those six
> injured from Alikozai; [including] . . . [R, son of S,] shot
> through both legs, a bullet still lodged in one of them . . . .
> As Dr. Hawks and his medics were frantic in saving
> innocent lives rather than take them, [appellant] continues
> his leisurely walk home.

In general, "'[d]eviation from a legal rule is error unless the rule has been waived.'" *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (quoting *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011)). As our superior court has explained, "[while an appellate court] reviews forfeited issues for plain error, [appellate courts] do not review waived issues because a valid waiver leaves no error to correct on appeal." *Id.* (internal citation omitted). "'Whereas forfeiture is the failure to make a timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.'" *Id.* (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). "'Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Ultimately, whether an appellant has waived an issue is a question of law we review de novo. *Id.* (citing *United States v. Rosenthal*, 62 M.J. 261, 262 (C.A.A.F. 2005)).

Pursuant to Article 36(a), UCMJ, Congress delegated to the President the authority to prescribe procedural and evidentiary rules for courts-martial. Under the applicable procedural rules, the President has prescribed that the "*[f]ailure to object* to improper argument before the military judge begins to instruct the members on findings *shall constitute waiver* of an objection." R.C.M. 919(c) (emphasis added). Similar to the procedural rule at issue in *Ahern*, "[t]his is not a case where the rule uses the word 'waiver' but actually means 'forfeiture.'" 76 M.J. at 197 (citing as an example R.C.M. 920(f), which equates the failure to object to panel instructions with "waiver of the objection in the absence of plain error"). Therefore, as a matter of law, appellant is not entitled to the three-part review for plain error. Instead,

appellant is entitled to a review of the *validity* of his waiver.[5] *See id.* (contrasting the review applicable to forfeited issues and waived issues).

In this case, appellant failed to object to a single reference of "innocent people" or "farmers" during argument. Accordingly, this issue is waived and there is no legal error to correct on appeal. Moreover, there is no cause for us to exercise our discretionary authority to address this issue notwithstanding appellant's waiver. Even assuming appellant preserved this issue for appellate review, we find neither error in nor prejudice from trial counsel's argument. In its full context, trial counsel's reference to "innocent people" or "farmers", "did not manipulate or misstate the evidence." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). In fact, the innocent people referred to were in their homes asleep when they were attacked by appellant.

## C. Appellant's Alleged Use of Lariam

At his guilty plea, appellant waived the defense of voluntary intoxication. On appeal, however, appellant personally avers the government failed to provide him with information that he had been prescribed an anti-malaria medication called Lariam, also known by its chemical component name mefloquine hydrochloride. To support this claim, appellant submitted an affidavit from a noncommissioned officer who believed appellant was prescribed Lariam. Appellant also provided an affidavit from Dr. Remington Nevin, a medical expert retained by appellant in 2017, who similarly believed appellant was exposed to Lariam during his deployment to Iraq in 2003-2004. Appellant concedes his medical records are void of any information about him being prescribed Lariam. Instead, appellant's medical records indicate he was prescribed a different anti-malaria medication, doxycycline hyclate, on 4 October 2011 and the prescription was last refilled on 11 April 2012.

Based on these facts, appellant makes a two-fold assumption. First, he surmises that since a full bottle of doxycycline was collected among his personal effects after the charged offenses, he could not have been taking doxycycline. Second, he assumes he must have been taking Lariam as an alternative anti-malarial medication. However, appellate did not submit an affidavit claiming he ingested Lariam, nor did he provide an affidavit from any person that saw him take Lariam.

---

[5] Although this court can review issues waived at trial pursuant to its Article 66(c), UCMJ, authority, "[w]aiver at the trial level continues to preclude *an appellant* from raising the issue before either" this court or our superior court. *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citing *Gladue*, 67 M.J. at 313-14). Based on the facts in this case, we see no need to engage in a lengthy discussion or grant relief for these waived issues.

In response to the government's pretrial motion to compel reciprocal discovery, appellant admitted he was not aware of any medical records suggesting he was prescribed Lariam. In response, the government filed a subsequent motion to preclude evidence that appellant ingested Lariam. At the hearing on this motion, the military judge stated, "my understanding of that is that the defense doesn't intend to offer any evidence about that drug [Lariam] at all. That was my understanding of the defense's response." The defense responded, "That's correct, Your Honor."

To resolve this issue raised on appeal, appellant requests a fact-finding hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). Under the circumstances of this case, however, we see no need to order a *DuBay* hearing. Appellant's factual allegations—even if true—would not result in relief. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). Furthermore, the affidavits of the noncommissioned officer and Dr. Nevin "[do] not set forth specific facts but consist instead of speculative [and] conclusory observations . . . ." *Id.* Moreover, "the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of [appellant's claims]." *Id.* Applying the first, second, and fourth *Ginn* principles to appellant's submission, we reject appellant's claim that he was likely exposed to Lariam. Even assuming appellant was prescribed Lariam, there would still be no evidence he actually took it and was under its influence during the commission of his crimes.

## CONCLUSION

On reconsideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Senior Judge TOZZI and Judge SCHASBERGER concur.

FOR THE COURT:

JOHN P. TAITT
Acting Clerk of Court

13